In the Matter of the Application of the HOME INSURANCE COMPANY for an Order Confirming the Award on Arbitration between HOME INSURANCE COMPANY and ROSSIA INSURANCE COMPANY OF AMERICA and UNION RESERVE INSURANCE COMPANY.

Supreme Court, New York County, December 4, 1925.

Insurance — reinsurance — interpretation and sufficiency of arbitrator's award — " loss excess cover " contract executed on lapse of two of four reinsurance contracts — agreement was to reinsure whenever insured's loss exceeded $15,000 net for its own account by any one loss — net to be determined by deduction of amount reinsured under two existing contracts — loss cost fixed at one-half of insured's average aggregate losses in excess of net $15,000 on any one loss for two preceding years plus twenty per cent loading — losses must be determined on basis of two existing reinsurance contracts — loss cost fixed on basis of four reinsurance contracts in existence during two preceding years — award of umpire not impeached by concurrent memorandum by insurer's arbitrator — arbitrator's letter to Superintendent of Insurance not considered.

A " loss excess cover " contract executed by two reinsurance companies after the lapse of reinsurance policies issued by them, which provides that they shall reinsure another company whenever it shall have sustained a loss exceeding $15,000 net for its own account by any one loss, and that the word " net " amount of loss shall be arrived at by the deduction of all amounts reinsured by the insured under two existing reinsurance treaties or reinsured individually with other companies, does not impose an implied obligation on the insurer to substitute other reinsurance for that lapsed, and, therefore, the losses covered by the " loss excess cover " contract are to be determined on the basis of $15,000 net after deducting the amount received on the two existing reinsurance contracts.

The provision in the " loss excess cover " contract in reference to " loss cost," which is that the consideration payable by the insured under the " loss excess cover " contract shall be one-half of the average aggregate amount of its losses in excess of the net amount of $15,000 each sustained by any one loss during the two preceding years, plus a loading of twenty per cent, is construed to mean that in the determination of the losses in excess of the net amount there shall be deducted all amounts paid on the four reinsurance contracts then existing and that the net shall then be divided by two to determine the loss cost.

The award is not impeached by the fact that before the umpire delivered it he received a concurring memorandum from the reinsurance companies' arbi-

trator interpreting the award in accordance with the view of the reinsurance companies which is contrary to the decision of the umpire.

The arbitrator's own letter to the Superintendent of Insurance interpreting the award in accordance with the views of the insured is not considered, since it was written after his office as arbitrator had expired.

MOTIONS to confirm an umpire's award and to order judgment thereon.

*Rumsey & Morgan* [*David Rumsey* of counsel], for Home Insurance Company.

*Cabell, Ignatius & Lown* [*John W. Davis, Hartwell Cabell* and *Wallace T. Stock* of counsel], for Rossia Insurance Company.

*Davis, Polk, Wardwell, Gardiner & Reed,* for Union Reserve Insurance Company.

PROSKAUER, J.    A contract known as a " loss excess cover," executed on January 18, 1923, by the Home Insurance Company on the one hand and the Rossia Insurance Company of America and the Union Reserve Insurance Company (hereinafter called the reinsurers) on the other, provided (in so far as here material) that the reinsurers would reinsure the Home " whenever the Home shall have sustained a loss exceeding $15,000.00 net for its own account by any one loss, it being understood that the ' net ' amount of the ' Home's ' loss is arrived at by the deduction of all amounts reinsured by the ' Home ' under two existing reinsurance treaties, or reinsured individually with other companies."    The provision for the premium to be paid for this cover was:

" *Third.* The consideration or ' loss cost,' payable to the ' Rossia ' for the assumption of the excess loss liability under this cover for the year 1923, shall be one-half of the average aggregate amount of the ' Home's ' losses in excess of the net amount of $15,000.00 each sustained by any one loss during the years 1921 and 1922, as proved by the loss records of the ' Home.'    The consideration for each succeeding year shall be the result of a like calculation of the experience of the two preceding years.

" *Fourth.* The ' Home ' will allow the ' Rossia ' a ' loading ' of twenty per cent (20%) of the ' loss cost ' established for each year."

Controversy arising, the dispute was referred to arbitration. The sole issue before me is the sufficiency and meaning of the umpire's award with respect to the consideration to be paid under these paragraphs.    The parties have waived on argument a possible technical defect that neither arbitrator concurred specifically in the umpire's award.

In 1921 and 1922 the Home Insurance Company had four rein-

surance treaties, one with each of the present reinsurers, one with the Excess Insurance Company, Limited, of London and one with the Union Hispano Insurance Company. The treaties with the present reinsurers were terminated on December 31, 1922. The umpire's award finds that the termination of these two treaties was one of the inducing factors that led to the execution of the excess cover contract.

The Home Company claims that the losses to be paid by the reinsurers under the 1st paragraph of the contract are to be determined by the deduction (so far as reinsurance treaties are concerned) of the salvage only under the two treaties with the Excess Insurance Company and the Union Hispano Insurance Company, but that in fixing the premium under the provisions of paragraph 3, " the net loss " is to be computed by deducting the salvage under all four of the reinsurance treaties as they existed in 1921 and 1922.

The reinsurers claim either that under the provisions of paragraph 1 there was an implied obligation on the Home to substitute two other treaties for the two which lapsed on December 31, 1922, or that, if there was no such implied obligation, the premium under paragraph 3 should be computed from the 1921 and 1922 net losses as though only the Hispano and the Excess Insurance treaties were in force, thereby excluding from the computation all salvage under the two lapsed treaties.

The umpire has held in unmistakable terms that there was no implied obligation on the Home to substitute other reinsurance treaties for the two lapsed treaties. He finds: " The language itself is unambiguous * * *. The net loss is arrived at by the deduction of all amounts reinsured by the Home under *two* existing reinsurance treaties."

His award with respect to the premium reads:

" CLAIM ' J '

" This reads: ' The Home claims that the premium for 1923 and for each succeeding year that the contract remains in force be figured in accordance with the Home's interpretation thereof.'

" This claim of the Home is sustained in so far as it is in accordance with the foregoing awards of the Umpire, only and as it is affected by the ultimate findings of the independent audit provided for."

Each side urges that this award is in its favor. Recourse must be had to the previous portion of the umpire's award for enlightenment. The specific finding of the umpire is as follows: " The consideration for the loss cost would be arrived at by taking the 1921 and 1922 loss experience of the Home gross and deducting

therefrom all salvages and amounts reinsured by the Home under existing reinsurance treaties or reinsured individually with other companies. The result would be the net loss cost for the two years 1921 and 1922, which should be divided by two to obtain the average and to which should be added the loading of 20% as provided for in Article Four."

These words in themselves are unambiguous. The deduction from the gross loss is to be of " salvages and amounts reinsured by the Home under existing reinsurance treaties." Standing alone this obviously means all treaties existing in the years 1921 and 1922, the period to which the words refer. The reinsurance companies claim, however, that in the light of the other portions of the award the words take on the different meaning, that only the salvages under the two treaties are to be deducted. They urge that, because the umpire merely said " under existing," instead of " under all existing " treaties, he meant " under *two* treaties." Analysis of the umpire's award does not sustain this contention.

In determining that the net loss for 1923 " is arrived at by the deduction of all amounts reinsured by the Home under *two* existing reinsurance treaties," the umpire overrules the argument made by the reinsurers that it would be an unreasonable and unjust construction to hold that the losses for 1923 should be estimated by deducting only the salvage of the two treaties, while the premiums (based on the net losses for 1921 and 1922) should be estimated by deducting the salvage of all four. He states: " Must not an unbiased party regard it that this contingency was foreseen and was intended to be provided for in the provision for a 20 per cent loading, and by Article 8 of the Contract." He quotes a memorandum from the manager of one of the reinsurers, made just before the contract was executed, as follows: " Loading of 20% will doubtless be conceded. I have insisted upon this rate because we expect to make a ' reasonable ' underwriting profit of 5%. This is generally nowadays conceded to be a ' reasonable profit.' We expect to apply 5% to our expenses and a margin of 10% yearly for fluctuation in ' loss cost.' " Section 8 of the contract to which he refers provides that, notwithstanding the fixed term of the contract, if in any year the loss of the reinsurers amounted to fifty per cent more than the average annual consideration paid by the Home, " the Home agrees to continue the same for at least another year in order to afford " the reinsurers " an opportunity to equalize such loss." He comments on this section: " This Section 8 clearly contemplates the possibility that the first year or subsequent years might prove abnormally unprofitable, and it provides in a spirit of equity that should, during the life of the cover, the loss

refunds exceed the consideration paid by 50%, the Home cannot arbitrarily terminate the contract at such juncture." He adds most significantly: " Therefore it is provided that it shall be under obligation to continue the contract for at least another year, since it is evident that the heavy loss experience of one year would furnish a correspondingly heavy premium compensation for the succeeding year."

This goes to the very heart of the controversy. He disposes of the argument of injustice and unreasonableness, upon which the reinsurers relied before him (and are in substance relying here), by two considerations: *First*, to compensate them for figuring the initial premiums on the basis of a deduction of salvage from the four reinsurance treaties, while the losses were to be figured only on salvage from the two, the reinsurers had added an arbitrary overloading of twenty per cent; and *second*, that to compensate them for initial loss by reason of this disparity, they had inserted the proviso that if the losses were very great (to the extent of fifty per cent more than the premium in any year), the reinsurers might continue the contract for a year so as to secure the correspondingly larger premium based on the heavier losses of the preceding year.

Following this portion of his award, he states, under the section headed " premium consideration:" " The ' loss cost ' or premium consideration which is to form the base for loss claims must be regarded as on the same basis as the calculation for claims and the use of the word ' net ' must be interpreted alike in the places where it is found in the contract, unless there be anything in the context to change it." He adds: " The consideration for the ' Loss Cost ' would be arrived at by taking the 1921 and 1922 loss experience of the Home gross and deducting therefrom *all* salvages and amounts reinsured by the Home under existing reinsurance treaties." He continues: " Upon the old axiom that liability follows premium the basis for claims under Article First would be identical and would imply that the 1923 net loss experience of the Home was to be arrived at by taking the amount of gross losses incurred by each individual casualty (not policy) and deducting therefrom all amounts reinsured under reinsurance treaties."

One aspect of this language is strongly relied on by the reinsurers. They contend that the umpire writes that the identical method of computation is required with respect to the loss computation for 1923 and the premium computation by the measure of the losses for 1921 and 1922, and ask me to infer therefrom that he meant that if the salvage of but two treaties were to be deducted for the 1923 losses, identical salvage alone should be deducted from the 1921 and 1922 losses. But almost in his next sentence the umpire

negatives this construction. He adds: " It is neither provided nor inferred in the Articles that conditions which existed through 1921 and 1922 shall be perpetuated throughout 1923, or subsequent years." The premium for 1923 is " one-half of the average aggregate amount of the Home's losses in excess of the net amount of $15,000.00 each sustained by any one loss during the years 1921 and 1922." He points out that there is neither in paragraph 3 nor in paragraph 1 any implication into the contract of things not expressly stated. Paragraph 1 specifically refers to *two* existing reinsurance treaties. There were two existing reinsurance treaties in 1923. Paragraph 3 refers to the " net loss " of 1921 and 1922. There were four reinsurance treaties in those two years. His conclusion is that there is no warrant for reading into paragraph 3 a limitation to the two existing reinsurance treaties in determining what was in fact " one-half of the average aggregate amount of the Home's losses in excess of the net amount of $15,000." That such was his meaning is further indicated by his reliance on the implication against the reinsurers from the circumstance that they prepared the contract, from his repeated argument that if so serious a variance was intended, it would have been easy to express, and from the inherent basis of his reasoning above indicated.

His award cannot be construed or impeached in the light of the fact that before he delivered it he received a concurring memorandum from the reinsurers' arbitrator interpreting the award in accordance with their view.

The arbitrator's own letter to the Superintendent of Insurance, interpreting the award in accordance with the views of the Home Company, I have not considered. It was written after he was *functus officio* and under settled authority cannot be used.

Upon the argument it was agreed that if the decision were in favor of the Home Company, a further agreement or determination would have to be reached as to computation before a judgment could be ordered. The parties stipulated that if they could not agree on the computation, they would consent to the appointment of a referee to state the account under the arbitrators' award. That course will be followed.

The motion of the Home Insurance Company is granted and the motion of the reinsurers is denied as herein indicated. The order should be settled on notice and contain proper provision for the entry of a final order herein after the agreement of the parties upon the computation, or, in the alternative, after the coming in of a referee's report. If the parties are unable to agree upon a referee, the order may also provide for his appointment by the court.